87 U.S. 387 (____)
20 Wall. 387
NEW ORLEANS
v.
THE STEAMSHIP COMPANY.
Supreme Court of United States.

*390 Mr. W.H. Peckham for the appellant.
Mr. James Emott, contra.
*392 Mr. Justice SWAYNE (having stated the case) delivered the opinion of the court.
The questions presented for our consideration are questions of law. The facts are undisputed. Our remarks will be confined to the several objections to the decree taken by the counsel for the appellant.
The fine of three hundred dollars imposed upon the mayor is beyond our jurisdiction. Contempt of court is a specific criminal offence. The imposition of the fine was a judgment in a criminal case. That part of the decree is as distinct from the residue as if it were a judgment upon an indictment for perjury committed in a deposition read at the hearing.[] This court can take cognizance of a criminal case only upon a certificate of division in opinion. In Crosby's Case, Mr. Justice Blackstone said: "The sole adjudication for contempt, and the punishment thereof, belongs, exclusively and without interfering to each respective court." The Circuit Court having first acquired possession of the original case was entitled to hold it exclusively until the case was finally disposed of.[] Any relief to which the city was entitled should have been sought there, and that *393 court was competent to give it, either in the original or in an auxiliary case. As to any other court the matter was ultra vires.[*] It was unnecessary, unwarranted in law, and grossly disrespectful to the Circuit Court to invoke the interposition of the State court as to anything within the scope of the litigation already pending in the Federal court.
The order of General Canby, No. 11, was issued seven months after the lease was made. The rights it conferred upon the lessees, whatever they were, had then become fully vested. The order did not purport to annul the lease. It prescribed a rule of conduct as to giving such leases in the future, and concluded as follows: "And any alienation, disposition, or grant will be subject to any rights and interest of the General government which may be involved, and shall not extend beyond the time when the questions relative to those rights and interest may be determined by competent authority." It does not appear that the government ever took any action touching this lease. The order could not, therefore, in any view, affect the rights of the parties. The court did not err in refusing to receive it in evidence.
It has been strenuously insisted that the lease was made by Kennedy without authority, was, therefore, void ab initio, and, if this was not so, that its efficacy, upon the principle of the jus post liminium, wholly ceased when the government of the city was surrendered by the military authorities of the United States to the mayor and council elected under the city charter.
Although the city of New Orleans was conquered and taken possession of in a civil war waged on the part of the United States to put down an insurrection and restore the supremacy of the National government in the Confederate States, that government had the same power and rights in territory held by conquest as if the territory had belonged to a foreign country and had been subjugated in a foreign *394 war.[*] In such cases the conquering power has a right to displace the pre-existing authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. It may appoint all the necessary officers and clothe them with designated powers, larger or smaller, according to its pleasure. It may prescribe the revenues to be paid, and apply them to its own use or otherwise. It may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war. These principles have the sanction of all publicists who have considered the subject.
They have been repeatedly recognized and applied by this court.[] In the case last cited the President had, by proclamation, established in New Orleans a Provisional Court for the State of Louisiana, and defined its jurisdiction. This court held the proclamation a rightful exercise of the power of the executive, the court valid, and its decrees binding upon the parties brought before it. In such cases the laws of war take the place of the Constitution and laws of the United States as applied in time of peace. It follows as a corollary from these propositions that the appointment of Kennedy as mayor and of the Boards of Finance and of Street Landings was valid, and that they were clothed with the powers and duties which pertained to their respective positions.
It can hardly be doubted that to contract for the use of a portion of the water-front of the city during the continuance of the military possession of the United States was within the scope of their authority. But, conceding this to be so, it is insisted that when the military jurisdiction terminated the lease fell with it. We cannot take this view of the subject. The question arises whether the instrument was a *395 fair and reasonable exercise of the authority under which it was made. A large amount of money was to be expended and was expended by the lessees. The lease was liable to be annulled if the expenditures were not made and the work done within the limited time specified. The war might last many years, or it might at any time cease and the State and city be restored to their normal condition. The improvements to be made were important to the welfare and prosperity of the city. The company had a right to use them only for a limited time. The company was to keep them in repair during the life of the lease, and at its termination they were all to become the property of the city. In the meantime the rental of eight thousand dollars a year was to be paid.
When the military authorities retired the rent notes unpaid were all handed over to the city. The city took the place of the United States and succeeded to all their rights under the contract.[*] The company became bound to the city in all respects as it had before been bound to the covenantees in the lease. The city thereafter collected one of the notes subsequently due, and it holds the fund, without an offer to return it, while conducting this litigation. It is also to be borne in mind that there has been no offer of adjustment touching the lasting and valuable improvements made by the company, nor is there any complaint that the company has failed in any particular to fulfil their contract.
We think the lease was a fair and reasonable exercise of the power vested in the military mayor and the two boards, and that the injunction awarded by the court below was properly decreed. The jus post liminium and the law of nuisance have no application to the case.
We do not intend to impugn the general principle that the contracts of the conqueror touching things in conquered territory lose their efficacy when his dominion ceases.
We decide the case upon its own peculiar circumstances, which we think are sufficient to take it out of the rule.
*396 We might, perhaps, well hold that the city is estopped from denying the validity of the lease by receiving payment of one of the notes, but we prefer to place our judgment upon the ground before stated.
JUDGMENT AFFIRMED.
Justices CLIFFORD, DAVIS, and BRADLEY did not hear the argument of this case, and did not participate in the judgment.
Mr. Justice HUNT, concurring.
I cannot assent to the proposition that the agents of the city appointed by the conquering power which captured it had authority to execute a lease of its levees and wharves continuing more than nine years after the conquering power had abdicated its conquest. If an extension of nine years may be justified, it would be difficult to repudiate an extension for ninety years, if that case should be presented. The lease under consideration was executed on the 8th day of July, 1865, to continue for the term of ten years. On the 18th of March, 1866, eight months and ten days afterwards, the military authority of the United States was withdrawn and the civil authority resumed its sway. The lease continued for that length of time during the military occupation of the city, and by its terms was to continue nine years, three months, and twenty days after the military dominion did in fact cease to exist. That the execution of this lease was an unwarranted assumption of power by the agents who made it, I quote Halleck on International Law and the Laws of War.[*] He uses this language:
"§ 4. Political laws, as a general rule, are suspended during the military occupation of a conquered territory. The political connection between the people of such territory and the state to which they belong is not entirely severed, but is interrupted or suspended so long as the occupation continues. Their lands and immovable property are, therefore, *397 not subject to the taxes, rents, &c., usually paid to the former sovereign. These, as we have said elsewhere, belong of right to the conqueror, and he may demand and receive their payment to himself. They are a part of the spoils of war, and the people of the captured province or town can no more pay them to the former government than they can contribute funds or military munitions to assist that government to prosecute the war. To do so would be a breach of the implied conditions under which the people of a conquered territory are allowed to enjoy their private property and to pursue their ordinary occupations, and would render the offender liable to punishment. They are subject to the laws of the conqueror, and not to the orders of the displaced government. Of lands and immovable property belonging to the conquered state, the conqueror has, by the rights of war, acquired the use so long as he holds them. The fruits, rents, and profits are, therefore, his; and he may lawfully claim and receive them. Any contracts or agreements, however, which he may make with individuals farming out such property, will continue only so long as he retains control of them, and will cease on their restoration to, or recovery by, their former owner." To which he cites Heffter;[*] Vattel;[] American Insurance Co. v. Canter,[] and other authorities. See also, Thirty Hogsheads of Sugar v. Boyle.[§]
The wharves and levees now in question were land and immovable property belonging to the conquered state. The fruits and rents of them were spoils of war which belonged to the conqueror so long as he held the conquered state. When the possession of the conqueror was at an end, the rights belonging to a conqueror ceased also. The spoils of war do not belong to a state of peace.
It is said that although this doctrine may be sound generally, it is not applicable to our recent civil war. But why not? The State of Louisiana was in rebellion against the United States government. It had formally disavowed its *398 association with the United States, and had formally become a member of another and hostile confederated government. The United States invaded its territory and captured its commercial metropolis, not figuratively or metaphorically, but literally and physically; with its ships, its cannon, and its men it battered down the forts built for its protection and drove out the armies by which it was defended. What it thus acquired by military power, it retained by the same power.
The armies of the revolting States were overthrown, and peace ensued. It was not, as the ancient historian said, "solitudinem faciunt, pacem appellant," but rest, repose, and rights restored. The State of Louisiana was again the sovereign authority in which all the administrative power of the State was vested. The city of New Orleans as a representative of the State, and under its authority, possessed the absolute control of its municipal powers, in the same manner and to the same extent as it possessed and exercised them before the existence of the war. The displaced government resumed its sway. The conqueror's possession ceased.
The State of Louisiana and the Confederate government were public enemies, not unsuccessful revolutionists merely. The forts of the Confederate States were blockaded as those of a foreign enemy, and vessels taken in attempting to enter them were adjudged prizes of war. A prize court is in its very nature an international tribunal. Their captured soldiers were not shot as rebels, but were exchanged as prisoners of war. All intercourse between the citizens of the contending States was illegal, contracts were dissolved or suspended, their property within our States was confiscated to the public use. In short, we were at war with them. It is difficult to understand why the postliminy doctrine is not applicable under such circumstances.
In Fleming v. Page,[*] Chief Justice Taney says: "The port of Tampico, at which the goods were shipped, and the Mexican State of Tamaulipas, in which it is situated, were undoubtedly, *399 at the time of the shipment, subject to the sovereignty and dominion of the United States. The Mexican authorities had been driven out or had submitted to our army and navy; and the country was in the exclusive and firm possession of the United States, and governed by its military authorities, acting under the order of the President. But it does not follow that it was a part of the United States, or that it ceased to be a foreign country in the sense in which these words are used in the acts of Congress... . While it was occupied by our troops, they were in an enemy's country and not in their own; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than the submission and obedience, sometimes called temporary allegiance, which is due from a conquered enemy when he surrenders to a force which he is unable to resist. Tampico, therefore (he says), was a foreign port when this shipment was made."
This case is authority to the proposition that conquest and temporary military possession do not alter the national character of a city or port. As Tampico remained Mexican, notwithstanding its conquest by our armies, so New Orleans, so far as the jus post liminii is concerned, remained a part of the Southern Confederacy.
There is, however, another view of the case that may be taken.
The care, custody, and control of wharves and levees is legitimately within the power of the city. Like streets and highways, they may be opened or closed in the discretion of the city. The mode in which they shall be used, how managed and regulated, whether open to the use of all indifferently, whether portions shall be set apart for particular uses, whether certain classes of business shall be confined to particular localities, whether controlled by the immediate agents of the city or managed by those to whom the city may lease them, are matters of police regulation to be settled by the authorities of the city.[*] In none of the cases is it to *400 be assumed that the power will be wilfully exercised to the injury of the city.
In my view, the agents of the city who made the lease of July 18th, 1865, which we are now considering, exceeded the authority they possessed. Their authority was limited to the time of the possession and control of the lots by the military authority which appointed them. The making of the lease, however, was not an illegal act in any other sense than that the agents had exceeded their powers. The excessive acts of those agents were capable of ratification, and if ratified, were as binding upon the principal as if originally authorized.
It appears that the lessees gave their notes (one hundred and twenty notes in number) for $666.66 each, payable monthly, for the whole amount of the rent to become due. The first nine of the notes were paid to the mayor and bureau acting under the military authority. The government of the city now in power was elected by the citizens according to law, in the ordinary manner, upon the resumption by the State and city of their civil powers, and was vested with the entire authority of the city in respect to wharves, levees, their management and control. Upon the principles already stated, it had power to lease the levee and wharf in question to the steamship company for the period named in the lease. Prior to the war, it had leased portions of its wharves to individuals, and had farmed out the collection of the levee dues upon the entire wharves by sections.[*]
It came into possession of the city government upon the election of its citizens on the 18th of March, 1866. Twenty-four days thereafter, to wit, on the 11th of April, 1866, the note for $666.66 due three days previously, was paid to the city government. At the same time all the other notes, one hundred and eleven in number, were transferred by the military government to the new city administration. These notes were retained by the city until several months after the present action was begun, when they were tendered to *401 the plaintiff by supplemental answer. No tender was ever made of the money, $666.66, received by the city upon the note paid to it by the plaintiff for the rent due April 8th, 1866. It now holds and enjoys, to that amount, the rent received by it under a lease which it seeks to repudiate.
The reception and holding of this rent is a clear and unqualified act of ratification, which bars the defence of a want of authority to execute the lease from which it issued. It is in violation of every principle of honesty and of sound morality, that one should retain the benefit of the act of his agent, and at the same time repudiate such act.[*]
A ratification once made, with a knowledge of all the material circumstances, cannot be recalled.[] A ratification of a part of a contract ratifies the whole.[] One act of ratification is as complete and perfect in its effect as any number of acts of the same character.
For these reasons I am able to
CONCUR IN THE AFFIRMANCE OF THE JUDGMENT.
Mr. Justice FIELD, dissenting.
I am unable to agree with the majority of the court in the judgment rendered. The power of the mayor and board of New Orleans, appointed by the commanding general upon the military occupation of that city, terminated with the cessation of hostilities; and I am of opinion that no valid alienation of any portion of the levee front and landing of the city could be made by them for any period extending beyond such occupation.
Assuming, as asserted, that the capture of New Orleans gave to the military authorities of the Union the same rights with respect to property there situated which would attend the conquest of a foreign country, the result is not different. A temporary conquest and occupation of a country do not *402 change the title to immovable property, or authorize its alienation. They confer only the rights of possession and use. When the military occupation ceases, the property reverts to the original owner with the title unimpaired.
"Of lands and immovable property belonging to the state," says Halleck, "the conqueror has by the rights of war acquired the use so long as he holds them. The fruits, rents, and profits are, therefore, his; and he may lawfully claim and receive them, but contracts or agreements, however, which he may make with individuals farming out such property, will continue only so long as he retains control of them, and will cease on their restoration to or recovery by their former owner."[*] Such is the language of all publicists and jurists, and there is nothing in the circumstances attending the military occupation of New Orleans by our forces which calls for any modification of the well-established rule of public law on this subject. The fact that New Orleans is a part of one of the States of the Union certainly ought not to be deemed a reason for enlarging the power of the military commander, but on the contrary would seem to be good ground for restricting it.
It appears to me to be perfectly clear that, according to settled doctrines of public law, questioned by no publicists, but everywhere recognized, the authorities of New Orleans were restored to as complete control over the levee front and landing of the city upon the cessation of the military occupation as they possessed previously, and had, in consequence, a perfect right to remove all obstacles to the public use of such levees and landings.
I do not see any ground for the application of the doctrine of ratification in the case. The civil authorities of the city were restored to power in March, 1866, and in April following they asserted their right to remove the obstructions to the levees created by the steamship company, and took steps to enforce it. In this proceeding they repudiated instead of ratifying the action of their military predecessors. The one *403 hundred and eleven unpaid notes of the company received by their predecessors have been deposited in court subject to the company's order, and the failure to restore or tender the proceeds of one note, amounting to six hundred and sixty-six dollars, previously paid, may be justified or explained on grounds consistent with the repudiation of the lease. Ratification of unauthorized acts of public agents, or persons assuming to be public agents, can only be inferred from conduct indicating an intention to adopt the acts and inconsistent with any other purpose. The alienation by sale or lease of any portion of the public levees and landings of the city after the restoration of its civil authorities could only be made, if at all, by ordinance or resolution of its common council, and it may be doubted whether there could be a ratification of an unauthorized alienation, attempted by their predecessors, by any proceeding less direct and formal.
I am of opinion, therefore, that the decree of the court below should be reversed, and the bill be dismissed.
NOTES
[] Crosby's Case, 3 Wilson, 188; Williamson's Case, 26 Pennsylvania State, 24; Ex parte Kearney, 7 Wheaton, 41.
[] Taylor v. Taintor, 16 Wallace, 370; Hagan v. Lucas, 10 Peters, 400; Taylor v. Carryl, 20 Howard, 584.
[*] Freeman v. Howe, 24 Howard, 450; Buck v. Colbath, 3 Wallace, 334.
[*] The Prize Cases, 2 Black, 636; Mrs. Alexander's Cotton, 2 Wallace, 417; Mauran v. The Insurance Company, 6 Id. 1.
[] Cross v. Harrison, 16 Howard, 164; Leitensdorfer v. Webb, 20 Id. 176; The Grapeshot, 9 Wallace, 129.
[*] The United States v. McRae, 8 Law Reports, Equity Cases, 75.
[*] Page 780, § 4.
[*] Droit International, §§ 131-133, 186.
[] Droit des Gens, liv. 3, ch. 13, § 197, et seq.
[] 1 Peters, 542.
[§] 9 Cranch, 191.
[*] 9 Howard, 614, &c.
[*] Slaughter-House Cases, 16 Wallace, 36.
[*] 1 Dillon on Municipal Corporations, §§ 43, 64, 67, 74, 181.
[*] Story on Agency, §§ 239, 240, XXX-X-X-X; Bissell v. Michigan Southern and Northern Indiana Railroad Company; 22 New York. 258; Parrish v. Wheeler, Ib. 504; Perkins v. Washington Insurance Co., 4 Cowen, 645; Peterson v. Mayor, 17 New York, 449.
[] Story on Agency, § 242.
[] Ib. and § 250.
[*] On International Law, chap. 32, § 4.